UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
DOCKET NO. 5:19-CR-00022-MOC-DSC

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| vs. | ) | |
| | ) | |
| 1) GREG E. LINDBERG, | ) | |
| 2) JOHN D. GRAY, | ) | **ORDER** |
| 3) JOHN V. PALERMO, JR., and | ) | |
| 4) ROBERT CANNON HAYES, | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** is before the Court on Motions to Dismiss the Indictment, filed by defendants Greg Lindberg, John Gray, and John Palermo, Jr., pursuant to Federal Rule of Criminal Procedure 12(b). Lindberg and Gray both move to dismiss for failure to state an offense. (Doc. Nos. 64, 85). Palermo moves to dismiss for lack of specificity and for prosecutorial misconduct. (Doc. Nos. 95–96). For reasons discussed below, each motion to dismiss is denied.

**I.    BACKGROUND**

On March 18, 2019, a grand jury in the United States District Court for the Western District of North Carolina returned an indictment, charging Lindberg, Gray, Palermo, and Hayes with one count of conspiracy to commit honest services fraud, in violation of 18 U.S.C. § 1349, and one count of bribery concerning programs receiving federal funds and aiding and abetting the same, in violation of 18 U.S.C. §§ 666(a)(2) and 2.[1] For these motions, the allegations in that indictment are taken as true. See United States v. Engle, 676 F.3d 405, 415 (4th Cir. 2012).

---

[1] Hayes was also charged with three counts of making false statements to federal officials, in violation of 18 U.S.C. § 1001(a)(2), but those counts are not relevant to the pending motions.

From about April 2017 to August 2018: Lindberg served as the chairman of Eli Global, an investment company, and as owner of Global Bankers Insurance Group ("GBIG"), an insurance and reinsurance management company; Gray worked as Lindberg's consultant; Palermo operated as a vice president of Eli Global and as chairman of a Chatham County political party; and Robert Hayes served as chairman of a North Carolina state political party. (Doc. No. 3 ¶¶ 3–6). In those capacities, the defendants allegedly conspired to and "corruptly gave, offered, and promised things of value to [the Commissioner of the North Carolina Department of Insurance], including millions of dollars in campaign contributions . . ., in exchange for specific official action favorable to GBIG, including the removal of the Senior Deputy Commissioner of the [Department] responsible for overseeing the regulation, including the pending periodic examination, of GBIG." (Id. ¶ 14).

The indictment substantiates the alleged conspiracy in detail. Pertinent here, it asserts that Lindberg, Gray, and Palermo "surreptitiously met with the Commissioner at various locations throughout North Carolina . . . to discuss Lindberg's request for the removal of [the] Senior Deputy . . . in exchange for millions of dollars in campaign contributions to the Commissioner." (Id. ¶ 15). The first referenced meeting occurred on February 14, 2018, at Concord, North Carolina, and included Lindberg, Gray, and the Commissioner. There, Lindberg purportedly complained about the Senior Deputy, indicated she was "deliberately and intentionally and maliciously hurting [his] reputation with other regulators," and "suggested that the Commissioner hire Palermo at the [Department] in place of, or in a superior role to," the Senior Deputy. (Id. ¶¶ 31–32).

A second meeting allegedly occurred on March 5, 2018, in Statesville, North Carolina, and this time, Palermo attended as well. At that meeting, the Commissioner indicated he might be able to hire Palermo by April 1, to which Lindberg responded, "that'd be a homerun." (Id. ¶ 36). Gray suggested that Palermo should "report directly to [the Commissioner] so nobody at the

[Department] could question what Palermo was doing" and that the Commissioner should "set it so that if [the Senior Deputy] stays where she is, she doesn't breathe a word outside that office, or send a slip of paper outside that office, that is not reviewed first by [Palermo]." (Id. ¶ 37). The Commissioner asked to speak with Lindberg alone, then inquired, "What's in it for me?" (Id. ¶ 38). "Lindberg responded he would create an independent expenditure committee to support the Commissioner's re-election and fund it himself with $1 million to $2 million." (Id.).

Lindberg, Gray, Palermo, and the Commissioner met again on March 27, 2018, in the GBIG headquarters in Durham, North Carolina. This time, the Commissioner intimated "he did not think it would be a good idea to hire Palermo at the [Department], as it would be well known that Palermo came from Lindberg's company." (Id. ¶ 42). Lindberg agreed, suggesting "the Commissioner should instead move [the Senior Deputy] to another Division of the [Department] and move the head of the other Division . . . to [the Senior Deputy's] position." (Id. ¶ 43).

The indictment goes on to allege several additional meetings and communications where the defendants pressed the Commissioner for the removal and replacement of the Senior Deputy in exchange for donations. And on May 22, 2018, Palermo emailed the Commissioner and "requested certain information necessary to establish the independent expenditure committee." (Id. ¶ 53). Three days later, Palermo emailed Lindberg and Gray to let them know "independent expenditure committee to support the Commissioner would be ready in two weeks." (Id. ¶ 54).

On May 29, 2018, Lindberg and Gray met with the Commissioner at Lindberg's home in Durham. There, Gray summarized their proposal as follows: "if you're willing to have [the other Division head] handle everything from [GBIG], then we'll . . ." (Id. ¶ 57). At that point, Lindberg interjected, "We'll put the money in the bank." (Id.). Lindberg and Gray then called Palermo to discuss funding the independent expenditure committee. During that discussion, Lindberg

3

confirmed he would put $1.5 million into the committee and donate another $500,000 to the North Carolina State political party, for a total of $2 million. The Commissioner then agreed to "make the switch when we all get this . . .," to which Lindberg interjected, "Get the check cleared." (Id. ¶ 58). The Commissioner confirmed, and Lindberg replied, "That's a homerun." (Id.).

Later, Palermo sent Lindberg an email, stating he had created two corporate entities for the independent expenditure committee. Lindberg wrote a check to one entity for $500,000 and $1 million to the other. Palermo cashed the checks, telling Lindberg and Gray, "[i]n essence, for you[r] conversations with [the Commissioner], the 2 entities are ready to go." (Id. ¶ 60). On June 19, Gray informed the Commissioner that the committee was funded with $1.5 million. (Id. ¶ 61). But by July 6, the Commissioner still had not made the staffing change. Palermo thus sent an email to Lindberg, labeled "For Internal Use Only," stating "the Commissioner needs to man-up and do what he agreed to do" and to provide "an end date for it to happen." (Id. ¶ 63).

On July 25, 2018, Lindberg, Gray, and the Commissioner held a final meeting to discuss a "date certain" for the staffing change. (Id. ¶ 68). There, the Commissioner stated he was unhappy with the expenditure committee, so "Gray and Lindberg offered to transfer $250,000 [through the] State Political Party . . . to the Commissioner's campaign immediately, followed by another $250,000 after [the] Senior Deputy . . . was moved. Lindberg then stated that he would contribute $250,000 through [the party] to the Commissioner each quarter to make up the remainder of the $1.5 million." (Id. ¶ 71). Lindberg directed Gray to "get on the horn with [Hayes] right away. Get that check over to [the Commissioner] now. And then by the end of August we'll get you the balance, and we'll get the [other Division head]." (Id. ¶ 72). Hayes agreed to facilitate the transfer, and the next day, the funds were placed into the Commissioner's campaign account. Subsequently, the defendants were indicted, which led Lindberg, Gray, and Palermo to move for dismissal.

4

## II. DISCUSSION

The Federal Rules of Criminal Procedure "were designed to eliminate technicalities in criminal proceedings." United States v. Resendiz-Ponce, 549 U.S. 102, 110 (2007). To that end, federal indictments need only contain a "plain, concise, and definite statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is therefore "legally sufficient (1) if it alleges the essential elements of the offense, that is, it fairly informs the accused of what he is to defend; and (2) if the allegations will enable the accused to plead an acquittal or conviction to bar a future prosecution for the same offense." United States v. Rendelman, 641 F.3d 36, 43 (4th Cir. 2011); see Hamling v. United States, 418 U.S. 87, 117 (1974).

Despite these meager requirements, Federal Rule of Criminal Procedure 12 empowers the district court to dismiss indictments "where there is an infirmity of law in the prosecution." Engle, 676 F.3d at 415 (citation omitted). Under Rule 12(b)(3)(B)(v), the Court may dismiss an indictment for "failure to state an offense." And under Rule 12(b)(3)(B)(iii), the Court can dismiss an indictment for "lack of specificity." Even so, when confronted with a challenge to the indictment, the Court is "ordinarily limited to the allegations contained in the indictment." Engle, 676 F.3d at 415. In other words, the Court "may not dismiss an indictment . . . on a determination of facts that should [be] developed at trial." Id. (citation omitted).

Lindberg, Gray, and Palermo each contend the indictment is infirm and must be dismissed. Lindberg and Gray assert the indictment should be dismissed under Rule 12(b)(3)(B)(v) as it rests on a legally flawed understanding of honest services fraud and federal funds bribery. Lindberg argues the indictment should be dismissed: under Rule 12(b)(3)(B)(iii) because it is insufficiently specific as to his scienter and role in the conspiracy; and under the Court's supervisory powers because of prosecutorial misconduct. The Court rejects these arguments in turn.

5

### A. Failure to State an Offense

In the indictment, the defendants were charged with conspiring to deprive North Carolina and its citizens of the honest services of the Commissioner through bribery. See Skilling v. United States, 561 U.S. 358, 404 (2010) (construing the honest services statute as proscribing "fraudulent schemes to deprive another of honest services through bribes or kickbacks"). The parties agree that bribery should be defined with reference to the federal bribery statute, 18 U.S.C. § 201. See McDonnell v. United States, 136 S. Ct. 2355, 2365 (2016) (applying the same reference).

Here, the relevant bribery crime derives from Subsection 201(b)(1), which provides that a person who "directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity with intent . . . to influence any official act" shall be guilty of bribery. Lindberg and Gray contend their indictment for honest services fraud was infirm because it failed to describe an "official act." See United States v. Lee, 919 F.3d 340, 350 (6th Cir. 2019).[2]

---

[2] Citing decontextualized Fourth Circuit dicta, Lindberg and Gray assert that an "official act" is also required to sustain a federal funds bribery conviction. See United States v. Jennings, 160 F.3d 1006 (4th Cir. 1998). Several circuits have disagreed, recognizing that the federal funds bribery statute is broader than Section 201 and that the "official act" requirement derives from the plain text of Section 201. See United States v. Ng Lap Seng, 934 F.3d 110, 130 (2d Cir. 2019); United States v. Porter, 886 F.3d 562, 565 (6th Cir. 2018). In an event, for reasons discussed, even if an "official act" is required for federal funds bribery, the Court finds that element is satisfied here.

Through a few unsupported sentences, Gray also argues that the indictment also fails to state an offense for federal funds bribery because it does not show the alleged co-conspirators offered a thing "of value" to the Commissioner "in connection with any business." (Doc. No. 85-1 at 12). It strains credulity to suggest the funds placed in the Commissioner's campaign account do not hold "value" for the Commissioner. And whatever the limits of the phrase "in connection with any business," that term most certainly includes choosing a regulator who is responsible for regulating GBIG. Indeed, if choosing a regulator was not connected to GBIG's business, the co-defendants would have no reason to seek a "fair" Senior Deputy. (Doc. Nos. 64-1 at 2; 85-1 at 4).

6

Subsection 201(a)(3) defines an "official act" as "any decision on any question, matter, cause, suit, proceeding, or controversy, which may at any time be pending, or which may be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." In McDonnell v. United States, the Supreme Court further explained that the term "official act" is "specific and focused." 136 S. Ct. at 2372. It does not "sweep so broadly" as to encompass "merely setting up a meeting, hosting an event, or calling another official." Id. at 2368–72. Rather, the action on a pending matter or question "must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." Id. at 2371–72 (quoting 18 U.S.C. § 201(a)(3)).

Lindberg and Gray first contend the indictment fails because "a staffing change is not an official act within the meaning of McDonnell's first step." (Doc. No. 64-1 at 2; see Doc. No. 85-1 at 1). The Third Circuit rejected a similar argument in United States v. Fattah, 914 F.3d 112, 155–59 (3d Cir. 2019). There, a jury convicted a congressman of conspiring to commit honest services fraud when he hired a political consultant's girlfriend in exchange for various funds and services. See id. at 137–39. On appeal, the congressman contended that the decision to hire the girlfriend could not constitute an official act because such a routine decision "is nothing like a lawsuit, agency determination, or committee hearing." Id. at 156. The Court disagreed and held that the congressman "engaged in an official act." Id. at 157. In so finding, the Court explained that the hiring decision was "focused and concrete" and "within the specific duties of [the congressman's] position—[a] function conferred by the authority of his office." Id. at 156 (quoting McDonnell, 136 S. Ct. at 2369). And although hiring decision are "routine, . . . [o]fficial acts need not be momentous decision—or even notable ones. Judges, for example, make 'routine' evidentiary rulings every day, and yet it is beyond question that those rulings are official acts." Id.

7

The Third Circuit's reasoning is sound, and its logic plainly dictates the result here. Like the congressman in Fattah, the Commissioner of the North Carolina Department of Revenue is empowered by statute to "appoint or employ such . . . employees that the Commissioner considers to be necessary for the proper execution of the work of the Department." N.C. Gen. Stat. § 58-2-25. Thus, staffing decisions generally—and the decision to assign an employee to regulate GBIG in particular—are a formal exercise of official power.[3] Moreover, these staffing decisions are akin to "a lawsuit, agency determination, or committee hearing," as they require the Commissioner to evaluate current and prospective employees to determine whether they are "necessary" for the Department's work. As Fattah recognized, it is irrelevant that these evaluations routinely occur. Accordingly, the indictment appropriately identified a pending matter before the Commissioner.[4]

Next, citing McDonnell, Lindberg and Gray argue that the indictment was infirm because it failed to show that the Commissioner actually "made a decision or took an action 'on' [the staffing change], or agreed to do so." (Doc. No. 64-1 at 12 (quoting McDonnell, 136 S. Ct. at 2368); see Doc. No. 85-1 at 2). To be sure, McDonnell required this element to be proven in a prosecution under Subsection 201(b)(2), which prohibits payees from committing or agreeing to commit official acts in exchange for loans and gifts. See 136 S. Ct. at 2365. But this prosecution

---

[3] Gray attempts to isolate the Commissioner's decisions to "remove" and "replace" the Senior Deputy Official, suggesting that the decision to replace the Senior Deputy with Palermo might constitute an official act while the removal of the Senior Deputy would not. (Doc. No. 85-1 at 15). But there is no material difference between these staffing changes for purposes of the "official act" analysis. Both the removal and replacement of employees are within the statutory authority of the Commissioner, and both require the Commissioner to evaluate whether employees are "necessary" for the Department's work. Thus, either staffing change would constitute an "official act."

[4] Lindberg argues that a staffing change is not an "official act" because the defendants in no way requested an "ultimate outcome" in subsequent regulation. (Doc. No. 64-1 at 1). But McDonnell clarifies that "a decision or action on a qualifying step . . . would qualify as an 'official act.'" 136 S. Ct. at 2370 (emphasis added). As explained above, the staffing change itself is an "official act." It is irrelevant what other "official acts" might or might not have followed.

8

arises under Subsection 201(b)(1), which prohibits payors from giving or promising anything of value to a public official "with intent . . . to influence any official act." Notably, these two offenses are distinct, and the pertinent subsection here does not require the Commissioner to actually make a decision or agree to the staffing change. See United States v. Suhl, 885 F.3d 1106, 1112 (8th Cir.) ("Neither [the honest-services fraud or federal-funds bribery] statutes, nor McDonnell, imposes a universal requirement that bribe payors and payees have a meeting of the minds about an official act. A payor defendant completes the crimes of honest-services and federal-funds bribery as soon as he gives or offers payment in exchange for an official act, even if the payee does nothing or immediately turns him in to law enforcement"), cert. denied, 139 S. Ct. 172 (2018); United States v. Ring, 706 F.3d 460, 467 (D.C. Cir. 2013) (recognizing Section 201 "defines two separate crimes: the act of offering a bribe and the act of soliciting or accepting a bribe" and "in the context of a bribe payor[,] . . . the offer of the bribe is the violation of the statute . . . the official need not accept that offer"); United States v. Jackson, 371 F. Supp. 3d 257, 267 (E.D. Va. 2019).[5]

Even if McDonnell's second requirement did apply, the indictment provides a factual basis to find that the Commissioner "agreed" to the staffing change. Once Palermo and Lindberg noted the Commissioner would receive $2 million in campaign contributions for the change, the Commissioner "confirmed" he would "make the switch when . . . the check cleared." (Doc. No. 3 ¶ 58). The next day, Gray sent the contact information for the Commissioner's campaign treasurer

---

[5] Lindberg's contention that Skilling v. United States requires "an exchange of value," including an "official act [that] benefit[s] the payor" fails for the same reason. (Doc. No. 64-1 at 17). Skilling held that honest-services fraud "encompass[es] only bribery and kickback schemes." 561 U.S. at 412. In so holding, the Court recognized that Section 201(b) provides "content" for the term bribery. Id. And as discussed above, bribery under Subsection 201(b)(1) does not require the completion of an official act—only the offer of a bribe by the payor "with intent . . . to influence any official act." See United States v. Nouri, 711 F.3d 129, 139 (2d Cir. 2013) (recognizing that, after Skilling, "to violate the right to honest services, the charged conduct must involve a quid pro quo, i.e., an 'intent to give or receive something of value in exchange for an . . . act'").

to Lindberg, Palermo, and Hayes, and then payments were dispensed to the Commissioner. (Id. ¶¶ 59–60). Notably, even under Subsection 201(b)(2), "the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts." 136 S. Ct. at 2365 (quoting Evans v. United States, 504 U.S. 255, 268 (1992)). Therefore, the indictment alleges sufficient facts to find that the Commissioner agreed to take official action.

Lindberg and Gray next suggest the indictment should be dismissed as unconstitutional. They offer three reasons, but none are availing. First and second, they argue the indictment "raises significant federalism concerns" and "significant vagueness concerns." (Doc. No. 64-1 at 20–21; see Doc. No. 90 at 8). But the limiting constructions applied here are precisely those applied by the Supreme Court to calibrate those interests. See, e.g., McDonnell, 136 S. Ct. at 2375 (requiring an official act for an honest services fraud prosecution to avoid "vagueness concerns" and "federalism concerns"); Skilling, 561 U.S. at 412 (recognizing the honest services fraud statue is "not unconstitutionally vague" when "[i]nterpreted to encompass only bribery and kickback schemes"). The defendants have not raised new vagueness and federalism concerns which are beyond those addressed by the Supreme Court. And this Court will not supplant the Supreme Court's instruction by recalibrating those interests to prevent the defendants' prosecution.

Lastly, citing the First Amendment, the defendants assert the indictment interferes with a citizen's right to use campaign contributions to advocate for particular policies. (Doc. No. 64-1 at 19–20). To be sure, the Constitution protects a donor's right to support a candidate "on the basis of their views and what they intend to do or have done." McCormick v. United States, 500 U.S. 257, 272 (1991). But again, "the Supreme Court has repeatedly held that the Government's interest in preventing quid pro quo corruption or its appearance is sufficiently important to justify the regulation of campaign contributions." Wagner v. Fed. Election Comm'n, 793 F.3d 1, 8 (D.C. Cir.

10

2015) (quoting McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 197 (2014)); see Buckley v. Valeo, 424 U.S. 1, 26–27 (1976).  Thus, the First Amendment will not serve as a safe harbor to protect defendants from being prosecuted for quid pro quo corruption.

In sum, for the foregoing reasons, Lindberg's and Gray's Motions to Dismiss the Indictment as legally flawed are denied.

### B. Lack of Specificity

In a separate motion, Palermo raises several additional grounds that the indictment is insufficiently specific as to his role in particular and thus that the indictment should be dismissed against him.  The Court disposes of these alleged infirmities in turn.

First, Palermo asserts the indictment "lacks specificity as to the requisite mens rea of his corrupt intent." (Doc. No. 96 at 7).  Specifically, the indictment suggests he was only involved in the bribery scheme "in a purely administrative sense" and therefore did not have the "specific intent to give or receive something of value in exchange for an official act." (Id.).  Contrary to Palermo's assertion, the indictment provides ample evidence to show he had the requisite mens rea to participate in the indicted offenses.  First, as to honest services fraud, the grand jury found that Palermo and his co-defendants "did knowingly combine, conspire, confederate, and agree with one another . . . to deprive North Carolina and the citizens of North Carolina of their intangible right to the honest services of the Commissioner." (Doc. No. 3 ¶ 10 (emphasis added)).  Second, as to federal funds bribery, the grand jury found that Palermo and his co-defendants "did corruptly give, offer, and agree to give a thing of value to . . . the Commissioner, a public official . . ., intending to influence and reward the Commissioner in connection with the transfer of [the] Senior Deputy." (Id. ¶ 86 (emphasis added)).  These indictment thus contains the elements of the offenses charged as well as the "facts and circumstances as will inform the accused of the specific offense,

11

coming under the general description with which he is charged." United States v. Brandon, 298 F.3d 307, 310 (4th Cir. 2002) (quoting Hamling, 298 F.3d at 117–18). Such detailed allegations are more than sufficient to satisfy Rule 12's specificity requirement. See United States v. Ali, 735 F.3d 176, 193 (4th Cir. 2013) (recognizing that similar indictments "setting forth all of the statutory elements" and "the factual circumstances" of the offense are "routinely found . . . to be adequate").

Palermo next complains the indictment is "devoid of factual allegations sufficient" to show he participated in the "quid pro quo discussions" with the Commissioner. (Doc. No. 96 at 9–10). To start, it is worth noting that the indictment was not required to show Palermo himself actually participated in the discussions for either charge. Because Palermo was charged with conspiring to commit honest services fraud, the Government is simply required to "prove that two or more people agreed to commit an unlawful act, [i.e., honest services fraud,] and that [Palermo] willfully joined the conspiracy with the intent to further its unlawful purpose." United States v. Chittenden, 848 F.3d 188, 195 (4th Cir. 2017) (vacated on other grounds); see United States v. Burfoot, 899 F.3d 326, 335 (4th Cir. 2018) (noting the same). And because Palermo was charged with aiding and abetting in federal funds bribery, the Government is simply required to prove Palermo "knowingly associated himself with and participated in the criminal venture." United States v. Burgos, 94 F.3d 849, 873 (4th Cir. 1996); see United States v. Arrington, 719 F.2d 701, 705 (4th Cir. 1983) ("To be convicted of aiding and abetting, 'participation in every stage of the illegal venture is not required, only participation at some stage accompanied by knowledge of the result and intent to bring about that result.'" (emphases added) (citation omitted)).

Regardless, the indictment amply asserts Palermo participated in quid pro quo discussions with the Commissioner. For example, Palermo contacted the Commissioner and "requested certain information necessary to establish the independent expenditure committee," then contacted

12

Lindberg and Gray to let them know the committee "would be ready in two weeks." (Id. ¶¶ 53–54). And when Lindberg and Gray spoke with the Commissioner about the staffing change on May 29, 2018, they specifically called Palermo "to discuss funding the independent expenditure committee." (Id. ¶ 60). Consequently, even if the indictment was required to show that Palermo specifically participated in the discussions, there are abundant charges that he did just that.[6]

In essence, Palermo's "specificity" arguments are effectively challenges to the allegations in the grand jury indictment. But these arguments must be made at trial—not through a motion to dismiss an indictment. See Engle, 676 F.3d at 415. Because there is no serious contention that the indictment fails to "inform the accused of the specific offense . . . with which he is charged," Palermo's motion to dismiss for lack of specificity is denied. Brandon, 298 F.3d at 310.

### C. Prosecutorial Misconduct

In a last-ditch effort, Palermo asserts his indictment should be dismissed due to several forms of prosecutorial misconduct. It is well-established that this Court may exercise its supervisory power to dismiss an indictment for prosecutorial misconduct. See United States v. Derrick, 163 F.3d 799, 807 (4th Cir. 1998). Still, "an indictment may not be dismissed for prosecutorial misconduct absent a showing that the misconduct prejudiced the defendant." Id.; see Bank of Nova Scotia v. United States, 387 U.S. 250, 263 (1987). And even assuming there is prejudice, "dismissal of the indictment does not necessarily follow as [the appropriate] remedy." United States v. Dyess, 478 F.3d 224, 236 (4th Cir. 2007); cf. United States v. Hasting, 461 U.S. 499, 506 (1983) (finding it "inappropriate" to overturn a conviction for prosecutorial misconduct

---

[6] For the same reason, it is irrelevant whether the independent expenditure committees Palermo created were "part of an alleged scheme." (Doc. No. 96 at 10). Regardless of what the committees were legally empowered to do, there is ample evidence that Palermo himself conspired to commit honest services fraud and aided and abetted in federal funds bribery.

13

where "means more narrowly tailored . . . are available"). Having reviewed Palermo's contentions of misconduct, the Court finds each to be meritless. The Court briefly dispenses of them below.

First, Palermo asserts his indictment should be dismissed for government entrapment. According to Palermo, the Commissioner entrapped Lindberg and his co-defendants by asking "What's in it for me?" (Doc. No. 3 ¶ 38). Palermo rightly recognizes that this question can amount to entrapment and thus may entitle a defendant to an entrapment jury instruction at trial. See United States v. Sligh, 142 F.3d 761, 767 (4th Cir. 1998). But as the Fourth Circuit has recognized, the defense of entrapment is closely "intertwined . . . with the issue of intent" and is thus "seldom appropriate" to consider "prior to trial." United States v. Osborne, 935 F.2d 32, 38 (4th Cir. 1991) (emphasis in original); accord United States v. Schaffer, 586 F.3d 414, 426 (6th Cir. 2009). Because the evidence does not clearly establish entrapment, dismissal is inappropriate here.

Second, Palermo argues the Government committed prosecutorial misconduct by manufacturing venue in the Western District of North Carolina. To establish venue, the Government must produce sufficient evidence for a reasonable jury to conclude that the defendants committed an overt act in furtherance of the charged conspiracy inside the judicial district. See United States v. Day, 700 F.3d 713, 727 (4th Cir. 2012). And "simple acts such as phone calls from a district can give rise to venue in conspiracy cases." Id. In this case, the indictment alleged that the co-defendants met with the Commissioner on March 5, 2018, at the Statesville Regional Airport in Statesville, North Carolina to discuss the staffing change. (Doc. No. 3 ¶ 35–36). Based on Circuit precedent, this meeting is sufficient to establish venue in this district. See id.[7]

---

[7] Palermo suggests the Government wrongfully manipulated events to draw the co-defendants into this district, but the Fourth Circuit has held "[t]here is no such thing as 'manufactured venue' or 'venue entrapment.'" United States v. Al-Talib, 55 F.3d 923, 929 (4th Cir. 1995).

14

Finally, Palermo argues, without authority, that his indictment should be dismissed based upon "selective recording" by the Government of conversations between the Commissioner and the defendants. Few cases support such a dismissal, and those that do suggest the defendant must present evidence of "selective recording in bad faith." United States v. Chaudhry, 850 F.2d 851, 857 (1st Cir. 1988) (citing United States v. Quiovers, 539 F.2d 744, 746 (D.C. Cir. 1976)); see United States v. Campo Flores, No. 15-CR-765, 2016 WL 5946472, at *3 (S.D.N.Y. Oct. 12, 2016); cf. United States v. Andreas, 216 F.3d 645, 659 (7th Cir. 2000) (finding "selective recording without more" does not undermine the "fundamental[] fair[ness]" of a proceeding); United States v. Arteaga, 807 F.2d 424, 426 (5th Cir. 1986) (noting "there is an obligation to preserve recordings once they have been created, [but] there is no general duty to make recordings in the first place"). Palermo has failed to produce credible evidence that the Government selectively recorded discussions with the Commissioner in bad faith. Thus, even assuming the Court could dismiss an indictment for selective recording, The Court declines to do so here.

Accordingly, because Palermo's allegations of misconduct are meritless, the Court declines to dismiss Palermo's indictment based upon prosecutorial misconduct.

### III. CONCLUSION

For the foregoing reasons, the Court finds that there is a legally sufficient basis to support defendants' indictment for honest services fraud and federal funds bribery. Moreover, the indictment is sufficiently specific to give the defendants fair notice of the charged offenses. Finally, the defendants have failed to demonstrate prosecutorial misconduct warranting dismissal. Accordingly, the defendants' Motions to Dismiss the Indictment are denied.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Motions to Dismiss the Indictment, filed by Greg Lindberg (Doc. No. 64), John Gray (Doc. No. 85), and John Palermo, Jr. (Doc. No. 95) are **DENIED.**

Signed: January 30, 2020

Max O. Cogburn Jr
United States District Judge